IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

| | | |
|---|---|---|
| Access2Go, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 08-1166 |
| | ) | |
| The Hipage Company, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This case is before the Court for a Report and Recommendation on Defendant's motion to dismiss for insufficient service of process and lack of personal jurisdiction. For the reasons below, the Court recommends that the motion be denied.

## Standard

Plaintiff bears the burden of demonstrating the existence of personal jurisdiction. RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1275 (7th Cir.1997). If the District Court decides the personal jurisdiction question solely on written submissions, rather than holding an evidentiary hearing, Plaintiff's burden is to show a prima facie case for exercising personal

jurisdiction. Purdue Research Foundation v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 782 (7th Cir. 2003). In this case, the personal jurisdiction question is readily answered from the written submissions, making an evidentiary hearing unnecessary. [1]

"[U]nder the prima facie standard, the plaintiff is entitled to have any conflicts in the affidavits (or supporting materials) resolved in its favor." Purdue Research Foundation v. Sanofi-Synthelabo, S.A., 338 F.3d 773, 783, n. 14 (7th Cir. 2003); Central States, Southeast and Southwest Areas Pension Fund v. Phencorp Reinsurance Corp., Inc., 440 F.3d 870, 878 (7th Cir. 2006)(factual disputes resolved in favor the plaintiff, the allegations "'read . . . liberally, in . . . [their] entirety, and with every inference drawn in favor'" of Plaintiff."). Plaintiff's allegations are taken as true unless

---

[1]Plaintiff's burden in an evidentiary hearing would be preponderance of the evidence. Purdue Research, 338 F.3d at 782. It is not clear when, if ever, a District Court must hold an evidentiary hearing as opposed to deciding the question on the written submissions. See Hyatt International Corp. v. Coco, 302 F.3d 707, 713 (7th Cir. 2002)(If personal jurisdiction is challenged . . . , the court must decide whether any material facts are in dispute. If so, it must hold an evidentiary hearing to resolve them); Taurus IP v. DaimlerChrysler Corp., 519 F.Supp.2d 905, 912 (W.D. Wis. 2007)("When a party files a motion to dismiss for lack of personal jurisdiction, the Court has two options. It may hold a hearing or issue a ruling based on the parties' submissions."); O'Hare International Bank v. Hampton, 437 F.2d 1173, 1176 (7th Cir. 1971)(district court may "weigh affidavits"; where affidavits conflicted, appellate court took plaintiff's affidavits as true). In any event the Court is of the opinion that Plaintiff has satisfied both the prima facie standard and the preponderance of evidence standard, given the Seventh Circuit's repeated statements that conflicting affidavits must be resolved in the plaintiff's favor at this stage.

controverted by affidavit. <u>Travelers Cas. & Sur. Co. v. Interclaim (Bermuda) Ltd.</u>, 304 F.Supp.2d 1018, 1021 (N.D. Ill 2004). However, Plaintiff "must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction" if Defendants submit affidavits and other evidence in opposition. <u>Purdue Research</u>, 338 F.3d at 783.

## Allegations

Plaintiff alleges that Defendant hired Plaintiff, pursuant to a written contract, to establish "telecommunications capacity and services" comprised of "networked high speed internet access" at several of Defendant's facilities in Virginia, North Carolina, South Carolina, Georgia and Wisconsin. (Complaint ¶¶ 3, 7). The "Service Agreement" and separate "Service Orders" are attached to the Complaint and are all signed by Defendant's Information Technology Manager, Chris Unger. (Complaint ¶4, Ex. A).

For disputes, the Service Agreement chooses Illinois law and the Peoria County Circuit Court, or the Federal District Court for the Central District of Illinois:

> This Service Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois, without regard to any conflicts of law provision that would require the application of the law of any other jurisdiction. By its execution

> and delivery of the Service Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Service Agreement must be brought in the Circuit Court of Peoria County, Illinois, or in the Federal District Court for the Central District of Illinois, which courts shall have exclusive jurisdiction of all matters arising out of or in connection with this Service Agreement, except for the recognition or enforcement of an judgment rendered by said courts.

(¶ 19 of Service Agreement attached as Exhibit A to Complaint).

Paragraph 29 of the Service Agreement provides:

> Each Party executing this Agreement, and the Party on whose behalf he/she is executing, each expressly represents and warrants that such person has the authority to bind such Party to each of the obligations set forth herein and that no consents or authorities are required to perfect such authority.

The Service Agreement provides that it "supersedes all previous statements, representations, and agreements concerning the subject matter hereof, whether written or oral." (Complaint, Ex. A., Service Agreement ¶ 34). The Service Agreement is signed by Chris Unger as Director of IT of the Hipage Company, as are the separate service orders specifying the minimum service term and monthly charges for various Hipage facilities. (Exhibit A to Complaint).

On March 15, 2008, Defendant's President and CEO, Frank Daman, signed a credit application authorizing Plaintiff to check Hipage's credit and payment history. (Complaint, Ex. B). From February to April 2008, Chris Unger "was in contact with [Plaintiff and Plaintiff's agent] . . .regarding their progress in establishing the network. Mr. Unger worked with [Plaintiff] by specifying network capacity requirements at Defendant's various facilities." (Complaint ¶ 15).

"On or about April 21, 2008, Defendant breached the Service Agreement by claiming that it was never under contract with Access2Go. Defendant then commenced a practice of turning away technicians who were to perform final network installations and testing at some of Defendant's facilities." (Complaint ¶ 16). In May 2008, Plaintiff filed this lawsuit in the Circuit Court of Peoria County, seeking nearly $500,000 owed under the Service Agreement. Defendant removed the case on the basis of diversity jurisdiction and filed the instant motion to dismiss.

In June 2008, Hipage filed a Complaint in the Circuit Court for the City of Norfolk, Virginia, seeking a declaration that the Service Agreement is unenforceable. Access2Go removed that case to federal district court and moved to dismiss or transfer pursuant to the forum selection clause.

The Hipage Company, Inc., 08-CV-00336 (E.D. Va., Judge Friedman).  As of this writing, the last entry in the docket of that case states that a hearing was held on the motion to dismiss and "Court advised Report and Recommendation will recommend dismissal of this case."  PACER Service Center (Public Access to Court Electronic Records), 9/24/2008 minute entry in docket)(last visited 10/15/08).

**The Parties' Affidavits and Documentary Evidence**

Chris Unger avers that he is an employee of Hipage and was given the job of pricing possible replacements for Hipage's communication services provider.  (Unger Aff. ¶ 2, attached to d/e 7).  He disavows any authority to enter into contracts on behalf of Hipage, averring that he has never done so for contracts "similar" to the one at issue here.  (Unger Aff. ¶ 3).  He avers that "an internet communications broker" by the name of Wade Acheson contacted him to discuss the possibility of Plaintiff becoming Defendant's service provider.  (Unger Aff. ¶ 5).  Unger avers that Acheson provided initial estimates but told Unger that he could not provide a firm price quote unless the Service Agreement, Service Orders and Credit Application were signed.  (Unger Aff. ¶ 5, 8, 9).  Unger avers that he repeatedly told Acheson that he (Unger) did not have the authority to enter

into contracts on behalf of Hipage, and that Acheson repeatedly assured him that the documents did not create contracts, but were only necessary to provide firm price quotes. (Unger Aff. ¶¶ 9-12). Unger further avers that he "never communicated directly with Access2Go regarding the alleged Service Agreement and Service Orders. At his direction, all of my communications and dealings regarding the alleged Service Agreement, Service Orders, and Standard Credit Application were exclusively with Acheson." (Unger Aff. ¶ 14). Unger further avers that Acheson represented that he could help Hipage terminate its service contract with another provider ("Paetec"), which ran through June 30, 2009, but that Acheson never did so. (Unger Aff. ¶ 7).

    Defendant's President, Frank Daman, avers that "Unger has never had any authority to enter into contractual agreements on behalf of The Hipage Company, Inc., and specifically did not have authority to execute the documents on behalf of the Hipage Company, Inc., that Access2G0 claims create a contract." (Daman Aff. ¶ 8, attached to d/e 7). He further avers that he told Acheson in a phone conversation in April 2008 that Unger did not have the authority to enter into contracts for Hipage, and that Acheson admitted he knew this. (Daman Aff. ¶ 9). Unger avers that he

was present for that phone conversation and corroborates this admission. (Unger Aff. ¶ 13).

Acheson's affidavit, on the other hand, categorically denies Defendant's version of events. Acheson avers that he provided price quotes to Unger, and that Unger "held himself out as possessing the authority to enter into contracts on behalf of Hipage." (Acheson Aff. ¶ 5). Acheson avers that Unger indicated that he wanted to proceed with Access2Go based on the price quotes given. Acheson avers that "[t]he quoted price was the final price . . ., and I did not tell Mr. Unger that Access2Go needed additional information for the purpose of providing a firm quote . . . ." (Acheson Aff. ¶7). Acheson avers that Unger never said that he (Unger) lacked authority to enter into the contracts. Acheson further avers that he never told Unger that the contracts were not contracts but only needed to obtain firm quotes. (Acheson Aff. ¶¶ 7-9).

Acheson avers that, after the Service Agreement, Service Orders and Standard Credit Application were signed, "work began on the physical creation of the ordered communications network. Computer servers, routers, and associated "T1" high speed data lines were installed at Hipage's facilities." (Acheson Aff. ¶ 16). Acheson avers that it was not

until around April 14, 2008, when installation was nearly complete, that Hipage's President, Mr. Daman, phoned Acheson to tell him, outside of Unger's presence, that Unger had not been authorized to sign the Service Agreement, even though Daman had recently spoken with Acheson about the installation on or about April 3, 2008, and had made no such comment at that time. (Acheson Aff. ¶19-21). According to Acheson, in the April 15 phone call Daman asked that installation be delayed until "things could be resolved with Paetec." (Acheson Aff. ¶ 20).

In addition to Acheson's affidavit, Plaintiff submits e-mails between Unger and Access2Go discussing the information Access2Go needed to process Hipage's orders and coordinate the installation and activation of Access2Go's services at Hipage's facilities. In these e-mails, which run from February 2008 through April 8, 2008, Unger repeatedly provides information to coordinate installation of Access2Go's services, to correct misconfigurations, and schedule internet circuit "turn-up."[2]

---

[2] For example, Unger responded on February 27, 2008, that 30 "new IP's" were needed-"If you are requesting more than 26 I will send you a justification form as we go to ARIN for anything over 26 and have to justify." (d/e 11, Ex. B). A February 29, 2008 e-mail from Access2Go to Unger asks Unger to complete a form and states, "I have ordered the internet circuit since you answered the questions on that piece." Id. A March 14, 2008 e-mail from Access2Go acknowledges receipt of information for a new internet circuit and states, "Please let me know if you have any questions. Once the install is completed the circuit will be tested end to end and then we can schedule it for test and turn up." Id. Unger sent an e-mail to AccesstoGo on March 19, 2008,

## Analysis

### I. Personal Jurisdiction

#### A. General Substantive Law

"A federal court sitting in diversity has personal jurisdiction only where a court of the state in which it sits would have such jurisdiction." Citadel Group Ltd. v. Washington Regional Medical Center, 536 F.3d 757, 760 (7th Cir. 2008). Illinois has a "'catch-all'" statutory provision that allows for personal jurisdiction if permitted by the Illinois and U.S. Constitutions. Id. at 760-61. The Court focuses solely on federal law, for if personal jurisdiction is permissible under the U.S. Constitution, then it is presumably permissible under the Illinois Constitution. Id. (" . . . no case has yet emerged where due process was satisfied under the federal constitution but not under the Illinois constitution.").

Exercising personal jurisdiction must not "offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)(*quoted cite omitted*); Citadel Group Ltd., 536 F.3d at 761. Federal due process requires that Defendant have had

---

informing that "the spreadsheet is all the same across the board . . .ingress and egress profiles are 125." A "Notice of Completion and Billing" from Access2Go e-mailed to Unger on April 3, 2008 states "These circuits have been installed and are ready for activation." Further e-mails coordinate installation at other facilities.

"minimum contacts" with Illinois, purposeful contacts, not incidental. "Crucial to the minimum contacts analysis is a showing that the defendant 'should reasonably anticipate being haled into court [in the forum State],'. . . because the defendant has 'purposefully avail[ed] itself of the privilege of conducting activities there.'" Hyatt Intern. Corp. v. Coco, 302 F.3d, 707, 716 (quoted cites omitted); Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934, 943 (7th Cir. 2000).

Sufficient minimal contacts are present if the "controversies arise out of or are related to the defendant's forum contacts," otherwise known as "specific jurisdiction." Hyatt, 302 F.3d at 713.[3] For specific personal jurisdiction, "'the action must *directly arise* out of the specific contacts . . . .'" RAR Inc. v. Turner Diesel, Ltd., 107 F.3d 1272,1277 (7th Cir. 1997), *quoting with approval* Sawtelle v. Farrell, 70 F.3d 1381, 1389 (1st Cir.1995) (emphasis added in RAR).

---

[3]Plaintiff does not dispute Defendant's assertion that general personal jurisdiction is absent, nor does it appear that general jurisdiction is supported by the current record. Hyatt, 302 F.3d at 713 ("general jurisdiction" exists–where "the defendant 'has continuous and systematic' contacts with the state in question.")(quoted cite omitted).

## B. Effect of Forum Selection Clause on Personal Jurisdiction

A valid forum selection clause in a contract is a waiver of personal jurisdiction objections.  IFC Credit Corp. v. Aliano Bros. General Contractors, Inc., 437 F.3d 606, 609-10 (7th Cir. 2006).  Under federal law, a forum selection clause is treated "'like any other contractual provision and hence . . . enforce[d] . . . unless it is subject to any of the sorts of infirmity, such as fraud and mistake, that justify a court's refusing to enforce a contract.'"  Id. at 610 (*quoted cite omitted*).  "[A] forum selection clause is enforceable to the same extent as the usual terms of a contract, which mainly means unless it was procured by fraud or related misconduct."  Id. at 610; *see also* M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12 (1972).

The Seventh Circuit has stated that "the validity of a forum-selection clause depends on the law of the jurisdiction whose rules will govern the rest of the dispute."  IFC Credit Corp. v. United Business & Industrial Federal Credit Union, 512 F.3d 989, 991 (7th Cir. 2008).  Illinois law on the validity of forum selection clauses is "materially the same," as federal, though "more lenient toward the defendant . . . when there is a significant

inequality of size or commercial sophistication between the parties, . . ." which is not asserted here. IFC Credit Corp., 437 F.3d at 611-12.

Defendant asserts that Virginia law determines whether the forum selection clause is valid but does not adequately explain why. (d/e 7, p. 9). It appears that Defendant is asserting that Acheson's alleged fraud injured Hipage in Virginia, and therefore Virginia law determines the validity of the Service Agreement. The argument is a red herring because Defendant does not identify what Virginia law is on the validity or enforceability of forum selection clauses for purposes of personal jurisdiction.[4] In the Court's own cursory research, Virginia law regarding the enforceability of forum selection clauses appears similar to Illinois. Paul Business Systems, Inc. v. Canon U.S.A., Inc., 240 Va. 337, 397 S.E.2d 804 (1990)("contractual provisions limiting the place or court where potential actions between the parties may be brought are prima facie valid and should be enforced, unless the party challenging enforcement establishes that such provisions are unfair or unreasonable, or are affected by fraud or unequal bargaining power."); Vulcan Chemical Technologies, Inc. v. Barker, 297 F.3d 332, 338

---

[4]Defendant instead focuses on Virginia law regarding agency, apparent authority and fraudulent inducement. As discussed below, taking Acheson's affidavit as true, Unger did have the authority to bind Hipage and was not fraudulently induced into doing so.

(4th Cir. 2002) (discussing Virginia law and remarking that "absent a showing that the chosen forum is unreasonable or was imposed by fraud or unequal bargaining power, the parties' choice should be enforced."). Thus, the Court's Recommendation is the same regardless of whether Illinois, Virginia or federal law applies.

### C. Defendant's Arguments to invalidate Forum Selection Clause: Apparent Authority and Fraud

Defendant asserts that the Service Agreement cannot confer specific jurisdiction because Unger did not have the authority, either actual or apparent, to enter into it. Defendant also asserts that the forum selection clause cannot confer specific jurisdiction because it was procured by fraud--Acheson's alleged assurances that the contract was not a contract but instead only needed to provide firm quotes. These arguments, however, are based on the truth of the version of events set forth by Unger in his affidavit.

The Court does not need to decide whether Unger's version, even if true, would support nullifying the Service Agreement and its forum selection clause. *See, e.g.,* Nationwide Mutual Insurance Co. v. Muncy, 217 Va. 916, 234 S.E.2d 70 (contractual release effective where party had ability and opportunity to read it, despite statement by insurance adjuster

that release was "like a receipt"); Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 650 F.Supp. 1378, 1386 (W.D. Va. 1986)(even assuming misrepresentations were made about scope of release, "this deception did not excuse their failure to read the release."); Nilsson v. NBD Bank of Illinois, 313 Ill.App.3d 751, 762, 731 N.E.2d 774, 783 (1st Dist. 1999)( "a party who signs a written agreement and has had an opportunity to review it may not subsequently claim that he was fraudulently induced to enter into the agreement based on misrepresentations as to its terms."); Paper Express, Ltd. v. Pfankuch Maschinen, 972 F.2d 753, 758 (7th Cir. 1992)(reliance on misrepresentations as to effect of document not reasonable where plaintiff had opportunity to read document).

  The Court need not decide this because, at this juncture, the Court resolves factual disputes in Plaintiff's favor. That means that Acheson's affidavit is taken as true for purposes of this Recommendation. According to Acheson, Unger held himself out as having the authority to bind Hipage and did in fact have that authority. According to Acheson, Unger never said that he lacked the authority to enter into the Agreement on Hipage's behalf, and Acheson never told Unger that the documents were only needed to provide firm price quotes. Under Acheson's version, Daman,

Hipage's President, did not maintain that Unger lacked authority until Hipage had problems with Paetec (its prior, or perhaps, current provider), after Access2Go's installation was nearly complete. The other evidentiary documents submitted by Plaintiff (the e-mails, Service Agreement, Service Orders and Credit Application) further demonstrate Unger's authority to bind Hipage, the knowledge and approval by both Unger and Daman of the Agreement and of Plaintiff's reliance on that Agreement to begin installation.[5]

Thus, for purposes of the personal jurisdiction analysis and this Recommendation, Acheson committed no fraud and Unger had the authority to and did bind Hipage to the Settlement Agreement. Consequently, Plaintiff has made out prima facie case for personal jurisdiction.

## II.  Service of Process

Defendant argues that service was insufficient under Fed. R. Civ. P. 12(b)(4) and 12(b)(5) because Illinois law requires the summons to be served within 30 days after the date of issuance. The state court summons

---

[5] The affidavits of Unger and Daman say nothing about Access2Go's installation and activation of its services at Hipage's facilities. Nor does Daman mention his signature on the credit application listing Hipage's references that was sent to Hipage.

was issued on March 9, 2008 and was served on June 12, 2008. Defendant removed the case to federal district court on June 29, 2008.

Plaintiff, however, is correct that 28 U.S.C. § 1448 allows for service anew in a removed case:

> In all cases removed . . . in which any one . . . of the defendants has not been served with process, . . ., or in which process served proves to be defective, such process or service may be completed or new process issued in the same manner as in cases originally filed in such district court.

See Allen v. Ferguson, 791 F.2d 611, 615 (7th Cir. 1986)("If jurisdiction can be obtained over the defendant, then § 1448 permits service of process to be completed or new process to be issued in the same manner as in cases originally filed in federal district court."); Schmude v. Sheahan, 214 F.R.D. 487, 490 (N.D.Ill. 2003)("After removal, a plaintiff has two options for providing proper service of process: (1) service pursuant to Rule 4; or (2) service pursuant to state court rules if the plaintiff commenced such service prior to the removal.")

Fed. R. Civ. P. 4(m) provides for dismissal if service is not effected within 120 days of filing a complaint. On September 2, 2008, a federal summons was issued to Defendant which Plaintiff served on Defendant on September 10, 2008, within the 120 days. Accordingly, federal service on

Defendant was proper even if the state summons was not timely served.

WHEREFORE, the Court RECOMMENDS that Defendant's Motion to Dismiss be denied (d/e 6).

Any objections to this Report and Recommendation must be filed in writing with the Clerk of the Court within ten working days after service of a copy of this Report and Recommendation. See 28 U.S.C. § 636(b)(1). Failure to timely object will constitute a waiver of objections on appeal. Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986). See also Local Rule 72.2.

ENTER:   October 21, 2008

*s/ Byron G. Cudmore*

_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE