# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

| | | |
|---|---|---|
| Access2Go, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  08-CV-1166 |
| | ) | |
| The Hipage Company, Inc., | ) | |
| | ) | |
| Defendant | ) | |
| ------------------------------------- | ) | |
| The Hipage Company, Inc., | ) | |
| | ) | |
| Counter Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Access2Go, Inc., | ) | |
| | ) | |
| Counter Defendant | ) | |
| ------------------------------------- | ) | |
| The Hipage Company, Inc., | ) | |
| | ) | |
| Third Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Broadline Solutions, LLC, | ) | |
| Cottrell Communications Corp., | ) | |
| ZTA, LLC, Cavalier Telephone, LLC, | ) | |
| Christopher Unger, Neil Massey, | ) | |
| Tony Gattuso, | ) | |
| | ) | |
| Third Party Defendants. | ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This case is before the Court for a Report and Recommendation on the motion to dismiss counterclaims by Access2Go, Inc., (d/e 42) and the motion to dismiss third party claims by Broadline Solutions, LLC (d/e 74). For the reasons below, the Court recommends that the motions be granted in part and denied in part.

## Background

In May 2008, Plaintiff Access2Go, Inc. ("Access2Go"), filed this case in Peoria County Circuit Court against Defendant The Hipage Company, Inc. ("Hipage"), seeking nearly $500,000 owed under a Service Agreement and attendant Service Orders, all of which are attached to the Complaint. (Complaint, ¶ 4, Ex. A). Under the Service Agreement, Access2Go was to establish "telecommunications capacity and services" at several of Hipage's facilities in Virginia, North Carolina, South Carolina, Georgia and Wisconsin, in return for payments specified in the Service Orders. (Complaint ¶¶ 3, 7). Hipage allegedly breached the Service Agreement by refusing to allow Access2Go to install the equipment. Hipage claimed that it had never entered into the Service Agreement because it's employee,

Christopher Unger, had not been authorized to do so, and because Unger had been repeatedly assured that his signature on the documents created no binding contract. After Access2Go filed this case in state court, Hipage removed it to federal court on the basis of diversity jurisdiction and filed a motion to dismiss for lack of personal jurisdiction, which was denied.

Hipage followed with a third party complaint against several companies and individuals (d/e 18), along with counterclaims against Access2Go (d/e 20). The motions now before the Court are Access2Go's motion to dismiss the counterclaims, and Broadline, LLC's ("Broadline") motion to dismiss the third party claims against it.

### Hipage's Allegations and Claims

The factual allegations in Hipage's counterclaims and third party complaint are substantially identical and are set forth as true for purposes of this Recommendation. Hipage alleges that its employee, Christopher Unger, was instructed to obtain pricing information for telecommunication services for Hipage, to compare with Hipage's current provider, Paetec. (Third Party Complaint, d/e 18, ¶ 13).[1] Hipage has a contract with Paetec through October 2009. Id. at ¶ 39. Unger was only to obtain pricing

---

[1]For convenience, the Court cites only the third party complaint. The counterclaims contain identical allegations.

information and did not have the authority to enter into contracts on behalf of Hipage.  Id. at ¶ 27.

In pursuit of the pricing information, Unger had discussions with the other third party defendants, which included Broadline Solutions, LLC, ("Broadline"), an agent for Access2Go.[2] Id. at ¶ 16.  Wade Acheson was Unger's contact at Broadline and Acheson is also Access2Go's principal. Id. at ¶ 3.  The other third party defendants are various intertwined companies and their employees/agents/independent contractors: Cottrell Communications Corporation and its employee Neil Massey; Cavalier Telephone, LLC ("Cavtel") and its employee Tony Gattuso;[3] and ZTA, LLC ("ZTA"), of which both Tony Gattuso and Neil Massey are members.  ZTA is also allegedly an authorized agent of Cavtel and an agent/independent contractor of Broadline.  (Third Party Complaint, d/e 18, ¶ 6).  "At some point during his employment with Hipage, Unger became an agent, independent contractor and/or member of ZTA."  Id. at ¶ 7.[4]

_____

[2]Access2Go disputes that Broadline was its agent, but the Court accepts Hipage's allegations as true at this point.

[3]Cavtel has filed a motion for summary judgment, asserting that Gattuso was not its employee, but the Court accepts Hipage's allegations at this posture.

[4]According to the docket, Unger, a Third Party Defendant, was served in February 2009 (d/e 38) but has not appeared.  No action has been taken to move the case vs. Unger forward to closure.

A scheme to overcharge Hipage for telecommunication services and receive "kickbacks" allegedly emerged from these discussions. Unger disclosed Hipage's confidential information on its existing contract with Paetec to the third party defendants, which was used to develop Access2Go's proposal. (Third Party Complaint, d/e 18, ¶ 17, 107). Broadline intended for Access2Go to provide the services to Hipage under a proposed three year contract, with additional services provided by CavTel, presumably through ZTA.[5]  ZTA was to receive monthly commissions. Id. at ¶ 18. Broadline was also to receive monthly commissions over the course of the contract. Id. at ¶ 19. Access2Go would pay the commission to Broadline, and Broadline would forward to ZTA its share. Unger, Massey and Gattuso would then receive their own shares of the commission through ZTA. Id. at ¶ 22.

The third parties allegedly combined to "mark up" the proposed contract between Access2Go and Hipage in order to increase their share of the commissions. The third party defendants and Access2Go all knew that Unger was in on the deal and would be receiving a share of those

_____

[5]Cavtel maintains in its motion for summary judgment that it never proposed to provide services to Hipage and never did provide any services, but the Court must accept Hipage's version for purposes of this Recommendation.

commissions, even though Unger was also a Hipage employee and owed duties of loyalty to Hipage.  Id. at ¶¶ 24, 28.  They also knew that Unger did not have the authority to enter into the Service Agreement on behalf of Hipage, but they went ahead with the scheme, believing the Hipage would ultimately honor the Service Agreement regardless.  Id. at ¶ 27, 38. They also knew that Hipage had a contract with Paetec through October 2009 and that Hipage was soliciting bids from other companies as well as Access2Go.  Id. at ¶ 39.  In sum, Access2Go and the third party defendants "exploit[ed] Unger's access to Hipage's confidential and trade secret information . . . to fraudulently induce Hipage into a contract with Access2Go in order . . . to obtain generous commissions, or 'kick-backs.'" (d/e 68, p.2).

Unger signed the Service Agreement and Service Orders on behalf of Hipage on February 7, 2008.  Id. at ¶ 29.[6]  According to the allegations, "Broadline, by and through Acheson, expressly informed Unger that his endorsement on the alleged contract between Hipage and Access2Go was solely for the purpose of obtaining pricing information based upon, at a minimum, a site survey at each of Hipage's various locations."  (Third Party

---

[6]The allegations say February 7, 2006, but that is a typo, as the Agreement attached to the Complaint says 2008.

Complaint, d/e 18, ¶ 52).  "As of March 31, 2008, Hipage had no knowledge concerning any alleged contract between itself and Access2Go . . . .Hipage believe the documents purporting to be the alleged contract were simply a proposal for services from Access2Go based upon the representations of Unger made to Hipage."  <u>Id.</u> at ¶ 33.  On two separate occasions in April 2008, Hipage's President expressly informed Wade Acheson (of Broadline) that Unger did not have any authority to enter into contracts.  Acheson allegedly confirmed in those conversations that the documents signed by Unger had not created binding contractual obligations, but were needed only for pricing purposes.[7]  (<u>Id.</u> at ¶¶ 34, 36).  That month, Hipage had also asked for a price quote for the same services from a different company, and received a bid for more than $2,500 less per month than Access2Go's rates.  <u>Id.</u> at ¶ 35.  Despite Broadline's assurances that the documents created no contract, Access2Go attempted to execute the Service Agreement to install the services anyway.  AT&T began installing "internet loops sometime after April 3, 2008."  <u>Id.</u> at ¶ 32. Hipage turned away the technicians and this lawsuit followed.

---

[7]Acheson disputes this.

**Analysis**

As to Access2Go and Broadline, Hipage's third party complaint and

counterclaims set forth substantially the same remaining causes of action:[8]

Fraudulent Inducement to Contract
Rescission
Statutory Conspiracy to Injure Hipage's Business, Va. Code § 18.2-499
Common Law Conspiracy to Induce Breach of Contract
Conspiracy to Breach Duty of Loyalty and Fiduciary Duty
Violation of Virginia Uniform Trade Secrets Act
Conspiracy to Violate Virginia Uniform Trade Secrets Act

**I. Claims based on Virginia Statutes**

Hipage pursues three claims based on Virginia statutes:

1) conspiracy to injure its trade or business under Va. Code §§ 18.2-499;

2) violation of the Virginia Uniform Trade Secrets Act, Va. Code Ann.

§ 59.1-336 *et seq.*; and 3) conspiracy to violate the Virginia Uniform Trade

Secrets Act.

Broadline and Access2Go argue that these claims must be dismissed

because Illinois law governs, both under the Service Agreement and the

"significant contacts" test. Therefore, they posit, there can be no claims

_____

[8]Hipage has withdrawn its claims for tortious interference with contractual relations and unjust enrichment (Counts IV, V and XI in the third party complaint (d/e 18) and Counts IV, V and X in the amended counterclaims (d/e 20)).  The arguments on those counts are therefore moot.

arising under Virginia statutory law.  Hipage counters that Virginia law

applies to its claims because the claims do not arise under the Service

Agreement and the injuries Hipage suffered occurred in Virginia, as well as

the tortious conduct.[9]

The Service Agreement signed by Unger states:

This Service Agreement shall be governed by and construed in
accordance with the internal laws of the State of Illinois, without
regard to any conflicts of law provision that would require the
application of the law of any other jurisdiction.

Access2Go and Broadline argue that this provision is "broadly stated"

and encompasses Hipage's claims.  The Court respectfully disagrees.  This

sentence unambiguously designates Illinois law to govern and construe the

*Service Agreement.*  Hipage's claims do not involve construction of the

Service Agreement.  Hipage claims are for fraud in the inducement and

other tortious conduct.  A contract's choice of law provision "will not be

construed to govern tort as well as contract disputes unless it is clear that

this is what the parties intended."  Kuehn v. Childrens Hosp., 119 F.3d

1296, 1302 (7th Cir. 1997).  What is "broadly stated" is the Service

_____

[9]The parties do not address whether similar statutory actions exist under Illinois
law.  Illinois has adopted the Uniform Trade Secrets Act, 765 ILCS Section 1065 *et
seq.*, but the parties do not address if Illinois case law construing the Act is similar to
Virginia's.  Additionally, the parties do not address whether there is an Illinois statutory
claim similar to the Virginia statutory conspiracy claim, which allows for treble damages,
Va. Code Ann. Section 18.2-500.

Agreement's forum selection provision, which applies to "any matter under or arising out of or in connection with this Service Agreement . . . .", (Complaint, Ex. A, d/e 19). In the Court's opinion, it is clear that the Service Agreement's choice of law provision does *not* encompass torts, and therefore does not control as to choice of law for Hipage's Third Party Complaint.

Illinois law determines which state's law applies to Hipage's claims. Pittway Corp. v. Lockheed Aircraft Corp., 641 F.2d 524, 526 (7th Cir. 1981)(forum state's law applies in diversity case to determine choice of law). Under Illinois law, the state with the most "significant relationship" to the occurrence or parties applies. Id. "[T]his test embodies a presumption that the local law of the state where the injury occurred governs the rights and liabilities of the parties unless another state has a 'more significant relationship' to the occurrence or parties involved." Id. (quoted cite omitted). There is no precise formula for determining which state has the most significant relationship. Factors include the issues and claims involved, the respective states' policies, and:

> the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship, if any, between the parties is centered.

Id.; *see also* <u>Fredrick v. Simmons Airlines, Inc.</u>, 144 F.3d 500, 504 (7th Cir. 1998)(place of injury, place where wrongful conduct occurred, parties' domiciles, place where parties' relationship centered).

Hipage asserts that its injuries, all economic, occurred in Virginia, where its principal place of business is and where Unger committed his tortious acts. Besides Broadline (whose principal place of business is Minnesota) and Access2Go (whose principal place of business is Illinois), the other third party defendants are also located in Virginia. Broadline and Access2Go counter that Access2Go signed the Agreement in Illinois, payments and service inquiries under the Agreement were to be made to Access2Go in Illinois, and Access2Go's injury from the breach occurred in Illinois.

The Court concludes applying the above standards, that Virginia law applies to Hipage's claims. Hipage's claims do not involve the construction or execution of the Service Agreement; nor do they involve Access2Go's alleged injuries. Unger's alleged tortious conduct occurred while he was working for Hipage in Virginia, where he had access to the alleged confidential information which allowed him to concoct the scheme to

receive "kick-backs" and to impose the Service Agreement on Hipage without its knowledge or consent.[10]  It was because of Unger's location and position at Hipage in Virginia that the scheme was able to be perpetrated. Further, Access2Go and Broadline do not dispute that *Hipage's* injury occurred in Virginia, its principal place of business.

In sum, on this record the Court firmly believes that Virginia has the more significant contacts.  Accordingly, Hipage's claims based on Virginia statutory law should not be dismissed solely because they are based on Virginia, rather than Illinois law.  Access2Go and Broadline do not argue that the allegations fail to state a claim for relief under the Virginia statutes, so the Court does not address that question.

## II.    Common Law Claims

Herein, the Court discusses both Illinois and Virginia case law, even though the Court concluded above that Virginia law should apply.  The Court notes that its Recommendation on Hipage's common law claims is the same under either Illinois or Virginia law.

---

[10]It is true that Broadline (based in Minnesota) is alleged to have been a primary player in orchestrating the scheme, but no one asserts that Minnesota law applies, nor does the Court believe it should.  The parties agree that the choice is between Illinois or Virginia law.

## A. Fraudulent Inducement to Contract

Hipage's fraudulent inducement claim is against Broadline and Access2Go, which is allegedly vicariously liable for Broadline's actions because Broadline is Access2Go's agent.

Hipage alleges that "Broadline, by and through Acheson, expressly informed Unger that his endorsement on the alleged contract between Hipage and Access2Go was solely for the purpose of obtaining pricing information based upon, at a minimum, a site survey at each of Hipage's various locations." (Third Party Complaint, d/e 18, ¶ 52; Counterclaims, d/e 20, ¶ 45). Acheson allegedly told Unger that his signing the documents "would not create a contractual obligation . . . ." (Third Party Complaint, d/e 18, ¶ 5; Counterclaims, d/e 20, ¶ 46).

These allegations seem to directly contradict Hipage's other allegations that Unger was in on the scheme. The Court does not understand how Unger was tricked into signing the Service Agreement if he was part of the conspiracy to induce Hipage to enter into that agreement and receive kickbacks. Nevertheless, the Court will ignore the inconsistency for purposes of this Recommendation.

Broadline and Access2Go contend that the integration clause in the
Service Agreement precludes Hipage's fraudulent inducement claim.  The
integration clause provides that the "agreement . . . supercedes all previous
statements, representations, and agreements concerning the subject
matter hereof, whether written or oral."  (Complaint, Ex. A, para. 34).  In
Illinois, however, an integration clause only limits the evidence considered
in a dispute over the contract's meaning, not whether the contract was
induced by fraud.  Vigortone AG Products, Inc. v. PM AG Products, Inc.,
316 F.3d 641, 644 (7th Cir. 2002)(integration clause "has nothing to do with
whether the contract was induced, or its price jacked up, by fraud.")
(predicting Illinois Supreme Court's likely holding).  Virginia law is similar,
holding that contractual disclaimers do not preclude fraudulent inducement
claims, unless the disclaimers specifically cover the alleged fraudulent
statements.  Hitachi Credit America Corp. v. Signet Bank, 166 F.3d 614,
630-31 (4th Cir. 1999).

Access2Go and Broadline argue that the integration clause also
functions as a "no-reliance" clause.  A "no-reliance" clause might preclude
a fraudulent inducement claim, Vigortone AG Products, Inc., 316 F.3d at
644, but the integration clause here is not a no-reliance clause.  Id.  There

is no mention about the parties' reliance on statements.  *Compare with*

Extra Equipamentos E Exportacao Ltda. v. Case Corp., 541 F.3d 719, 722

(7th Cir. 2008)(provision was clearly no-reliance:  "The parties are not

relying on representations or statements made by the other party or any

person representing them except for the representations and warranties

expressed in this Release.").  The integration clause therefore does not bar

the fraudulent inducement claim.

Broadline and Access2Go also assert that the fraudulent inducement

claim fails to state fraud with the particularity required by Fed. R. Civ. P.

9(b).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must

state with particularity the circumstances constituting fraud or mistake."

Windy City Metal Fabricators & Supply, Inc. v. CIT Technical Financing,

536 F.3d 663, 668 (7th Cir. 2008)("The circumstances of fraud or mistake

include 'the identity of the person who made the misrepresentation, the

time, place and content of the misrepresentation, and the method by which

the misrepresentation was communicated to the plaintiff.'"); DiLeo v. Ernst

& Young, 901 F.2d 624, 627 (7th Cir.1990)("the who, what, when, where,

and how: the first paragraph of any newspaper story.").

In the Court's opinion, the alleged false representation is described with sufficient particularity: the false representation was that Unger's signature on the Service Agreement did not create contractual obligations and was needed only to provide pricing information. The person who made this false statement is also identified: Unger. The specific dates that the false statements were made to Unger are not set forth, but there is an affidavit from Unger in the record that the representations were made in early January 2008 through February 7, 2008, when Unger signed the Service Agreement. (d/e 7, Ex. B, Unger affidavit ¶¶ 8-11). Third Party Defendant Unger no longer works for Hipage and has not appeared in this action, so it is not clear if a more specific date is within Hipage's knowledge at this point.[11] The Court therefore does not believe that a lack of more specificity on dates should require dismissal. How the false statement was communicated is also not set forth. The false statements in all likelihood were made orally over the telephone, since Hipage does not contend that they were written.

_____

[11]Acheson allegedly repeated these false assurances to Hipage's President on April 3, 2008, but those false statements are not part of the fraudulent inducement count.

In sum, the Court is of the opinion that the allegations, though "bare bones", give sufficient details of the "who, what, when, where and how" of the fraud. The Court does not believe that more detail is required by Rule 9(b) and therefore does not recommend dismissal on this ground.

As to Access2Go, its liability is allegedly vicarious, based on the allegations that Broadline is Access2Go's agent. (Third Party Complaint, d/e 18, para. 60). Alleging vicarious liability is governed by Fed. R. Civ. P. 8 (notice pleading), not Rule 9(b). *See* Lachmund v. ADM Investor Services, 191 F.3d 777, 783 (7th Cir.1999)(agency need not be pled with particularity unless it is based on same allegations used to establish alleged fraud), *cited by* Guaranty Residential Lending, Inc. v. International Mortg. Center, Inc., 305 F.Supp.2d 846, 853 (N.D. Ill. 2004)("An agency relationship establishing vicarious liability for fraud generally does not have to be pleaded with particularity.").

Whether the allegations plausibly state a claim for fraudulent inducement is a different question. Factual allegations are accepted as true and need only give "'fair notice of what the . . . claim is and the grounds upon which it rests.'" EEOC v. Concentra Health Serv., Inc., 496 F.3d 773, 776-77 (7th Cir. 2007), *quoting* Bell Atlantic Corp. v. Twombly,

127 S.Ct. 1955, 1964 (2007)(other citation omitted). However, the plaintiff's "' . . . allegations, [must] show that it is plausible, rather than merely speculative, that he is entitled to relief.'" <u>Tamayo v. Blagojevich</u>, 526 F.3d 1074, 1083 (7th Cir. 2008)(quoted and other citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949-50 (2009), *citing* <u>Twombly</u>, 127 S.Ct. 1955. Legal conclusions, unsupported by alleged underlying facts, are not entitled to "the assumption of truth." <u>Id.</u> at 1951.

"To prevail on an actual fraud claim under Virginia law, a plaintiff must prove by clear and convincing evidence '(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party mislead, and (6) resulting damage to the party misled.'" <u>Hitachi Credit America Corp. v. Signet Bank,</u>166 F.3d 614, 628 (4th Cir. 1999), *quoting* <u>Evaluation Research Corp. v. Alequin</u>, 439 S.E.2d 387, 390 (Va.1994). Illinois law is the same. *See* <u>Kapelanski v. Johnson</u>, 390 F.3d 525, 530 (7th Cir.2004)(knowing false statement of

material fact with "intent to induce action"; reasonable and justified reliance; damages).

A party's reliance on a fraudulent representation must be reasonable. Along these lines, Broadline argues that the "due diligence" rule precludes the fraudulent inducement claim because Unger had a duty to exercise due diligence by reading the contract and understanding its obligations before he signed it. Generally, a defense of fraud in the inducement is not available to someone who had an opportunity to read the contract before signing it. <u>Belleville National Bank v. Rose</u>, 119 Ill. App.3d 56, 59 (5th Dist. 1983)("[D]efense of fraud is, in most situations, unavailable to avoid the effect of the written agreement where the complaining party could have discovered the fraud by reading the instrument, and was in fact afforded a full opportunity to do so."); <u>Davis v. GN Mortgage Corp.</u>, 244 F.Supp.2d 950, 957 (N.D. Ill. 2003)("One is under a duty to learn, or know, the contents of a written contract before he signs it . . . .")(discussing application of due diligence defense to parol evidence rule). The "due diligence rule" is just another way of stating that reliance on false statements is unreasonable if a party has a chance to read the contract and the contract plainly contradicts the false statements. *See also*

Nationwide Mutual Insurance Co. v. Muncy, 217 Va. 916, 234 S.E.2d 70 (1977) (contractual release effective where party had ability and opportunity to read it, despite statement by insurance adjuster that release was "like a receipt"); Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 650 F.Supp. 1378, 1386 (W.D. Va. 1986)(even assuming misrepresentations were made about scope of release, "this deception did not excuse their failure to read the release."); Nilsson v. NBD Bank of Illinois, 313 Ill.App.3d 751, 762, 731 N.E.2d 774, 783 (1st Dist. 1999)( "a party who signs a written agreement and has had an opportunity to review it may not subsequently claim that he was fraudulently induced to enter into the agreement based on misrepresentations as to its terms.").

Hipage asserts that the due diligence rule applies only to claims for "fraud in the execution" not "fraud in the inducement."  The case cited, Davis v. GN Mortgage Corp., 244 F.Supp.2d 950, 957 (N.D. Ill. 2003), does not stand for that proposition.  Davis did involve a defense of fraud in the execution—the plaintiffs alleged that they had been led to believe they were signing a contract with different terms—but Davis did not hold that the due diligence rule is inapplicable to fraudulent inducement claims.  A person signing a contract has a duty to read and understand the contract

regardless of the nature of the alleged fraud.  The reliance on the fraudulent statement must still be reasonable whether the claim is for fraud in the inducement or fraud in the execution.

Hipage makes a stronger argument that determining the reasonableness of Unger's reliance at this stage is premature.  The cases cited by Broadline and the others cited above were all decided at the summary judgment stage or at trial.  *See also* James v. Lifeline Mobile Medics, 341 Ill.App.3d 451 (4th Dist. 2003)("Whether a party used ordinary prudence and due diligence is a question of fact to be determined by the trial court.").  However, "[a]lthough reliance is normally a question of fact, it can be determined as a matter of law when no trier of fact could find that it was reasonable to rely on the alleged statements or when only one conclusion can be drawn."  Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc., 250 F.3d 570, 574  (7th Cir. 2001)**.**  "In determining whether [ ] reliance was justified, we must consider all of the facts [known], as well as those facts [that] could have [been] learned through the exercise of ordinary prudence."  Id., *citing* Adler v. William Blair & Co., 271 Ill.App.3d 117 (1995).

In <u>Cozzi Iron & Metal, Inc.</u>, a lessor sued to recover amounts owed under a lease for photocopiers.  The lessee responded with a counterclaim for fraud, alleging that one of the lessor's employees had fraudulently represented that the lessee would be charged only for copies actually made, despite the lease agreements' clear statements otherwise.  The Seventh Circuit Court of Appeals upheld the dismissal of the common law fraud counterclaim on a Rule 12(b)(6) motion, agreeing that any reliance on the oral statements was unreasonable, because the lease clearly addressed the cost of the copies, contradicting those statements.[12]  *See also* <u>Runnemede Owners, Inc. v. Crest Mortg. Corp.</u>, 861 F.2d 1053, 1059 (7th Cir. 1988)(affirming 12(b)(6) dismissal of claims for breach of contract and fraud: reliance on alleged oral statements that were directly contradicted by written terms was not reasonable).  Virginia also seems to allow for dismissal at this early stage in similar situations.  *See* <u>King Industries, Inc. v. Worlco Data Systems, Inc.</u>, 736 F.Supp. 114, 119 (E.D. Va. 1989)(dismissing under Rule 12(c) and 12(b)(6) fraudulent inducement claim where plaintiff alleged terms of contracts were not what had been

_____

[12]The Seventh Circuit Court of Appeals reversed the dismissal of the claim under the Illinois Consumer Fraud Act, on the grounds that the Act did not require reliance on the fraud.  250 F.3d at 576.  That part of the decision is not relevant, since no claims are pursued under that Act.

promised in prior letter, where buyer could have discovered the inconsistencies by reading the document).

Hipage argues that "no reading of the document could have revealed the trickery, deceit, and conspiracy alleged . . . ." (d/e 79, p. 18). Yet the fraudulent statement alleged–that's Unger's signature would not create contractual obligations–is directly and plainly contradicted by the terms of the Service Agreement and Service Orders. The Service Agreement sets forth the specific terms under which Access2Go will provide services to Hipage, and the Service Orders specify the monthly payments Hipage will pay for those services. The first line of the Service Agreement states "This Service Agreement, along with all associated Service Schedules and Orders, sets forth the terms and conditions under which Access2Go, Inc., will provide facilities and services to the Customer . . . ." (Complaint, d/e 1, Ex. A). The Service Agreement contains all the kinds of provisions expected in a contractually binding agreement, addressing default, limitations on liabilities, renewal, termination, warranties, etc.. One would not even have to read every word of the document to know it is a binding contract: a cursory scan suffices.[13]

---

[13]The Court can consider the Agreement because it is attached to the Complaint and because it is central to Hipage's claim of fraudulent inducement.

Given the Service Agreement's obvious and direct contradiction of the alleged fraudulent representation, the Court believes that Hipage has failed to state a claim for fraudulent inducement as a matter of law. *See* Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc., 250 F.3d 570, 574 (7th Cir. 2001); Runnemede Owners, Inc. v. Crest Mortg. Corp., 861 F.2d 1053, 1059 (7th Cir. 1988); King Industries, Inc. v. Worlco Data Systems, Inc., 736 F.Supp. 114, 119 (E.D. Va. 1989). The Court acknowledges that the reasonableness of reliance is usually a question of fact not often appropriate for determination at this stage. Hipage's fraudulent inducement claim, though, is based entirely on Broadline's false assurance that the Agreement is not a contract, which it clearly is. The Court accordingly will recommend dismissal of the fraudulent inducement claim.

## B. Rescission

Hipage seeks rescission of the contract, on the grounds that Unger was fraudulently induced to sign it. As discussed above, the Court does not believe that Hipage has stated a claim for fraudulent inducement. Thus, the Court agrees with Broadline and Access2Go that Hipage cannot seek rescission of the contract based on Broadline's fraudulent

misrepresentations that the contract was not binding.[14]  This does not

mean that Hipage is bound by the contract.  If Hipage's allegations are

true, then Unger did not have the authority (apparent or express) to enter

into the contract.  Thus the contract would be voidable, since signing the

contract was outside Unger's authority and Hipage has not ratified the

contract.  *See*  Illinois State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co., 355

Ill.App.3d 156, 164 (1st Dist. 2004)(contract entered into by party without

authority to do so is void); Morris Law Office, P.C. v. Tatum, 388 F.Supp.2d

689, 702 (W.D. Va. 2005)(Under Virginia law, principal is bound by agent's

unauthorized acts if principal ratifies those acts).

## C.  Conspiracy to Induce Breach of Contract

Hipage alleges that the third party defendants and Access2Go

conspired to induce Hipage to breach its existing contract with Paetec, "in

an effort to receive monetary compensation they were otherwise not

entitled to."  (Third Party Complaint, d/e 18, para. 90).  However, this tort is

defined as "a conspiracy to procure the breach of contract and that

pursuant to such conspiracy the contract was breached."  Bowman v. State

---

[14]The Court agrees with Hipage, though, that whether the parties can be restored
to the status quo before the Agreement cannot be determined at this stage because of
the factual determinations necessary.

<u>Bank of Keysville,</u> 229 Va. 534, 541 (1985)*(emphasis added)*; *see also*

<u>Fuente v. Honeggers & Co., Inc.</u>, 1986 WL 7699 *5 (N.D. Ill. 1986)(claim

for conspiracy to induce breach necessarily fails if there is no intentional

interference with contractual relations)(not Reported in F.Supp.); 15A

C.J.S. Conspiracy § 58.  By Hipage's own allegations, it is still under

contract with Paetec.  The Paetec contract was not breached, and thus this

claim fails.

### D.    Conspiracy to Breach Duty of Loyalty and Fiduciary Duty

Hipage pursues a third party claim for breach of duty of loyalty and

breach of fiduciary duty against Unger, its former employee.  Hipage

alleges that Unger breached his duties to Hipage when he failed to disclose

his relationship with the third party defendants, failed to disclose that he

would be receiving monthly commissions from Broadline, and disclosed

confidential information "related to Hipage's contractual relationship with

Paetec and its telecommunications services and costs" to the third party

defendants.  (Third Party Complaint, d/e 18, para. 98).

Hipage also pursues a claim for conspiracy to breach duty of loyalty

and fiduciary duty against the other third party defendants and Access2Go,

based on the same allegations made against Unger.  (Third Party

Complaint, d/e 18, Count VIII; Counterclaim, d/e 20, Count VII). Hipage alleges that the other defendants caused Unger to breach his duties, including causing him to disclose the confidential information to them. (Third Party Complaint, d/e 18, paras. 102-03; Counterclaims, d/e 20, paras. 91-92).

Broadline and Access2Go contend that the allegations do not give enough detail to provide notice of this claim. The Court disagrees. An employee owes fiduciary duties of loyalty to an employer, which would encompass a duty not to disclose confidential employer information for one's own personal financial gain and the financial gain of others. *See* Williams v. Dominion Technology Partners, L.L.C., 265 Va. 280 (2003)(employee breaches duty of loyalty to employer by, among other acts, "misusing confidential information"); Saks Fifth Avenue, Inc. v. James, Ltd., 272 Va. 177 (2006)(employee breached "fiduciary duty of loyalty and good faith" by providing competitor with confidential information and taking proprietary information); FoodComm Intern. v. Barry, 328 F.3d 300, 303 (7th Cir. 2003)(agents owe fiduciary duties of loyalty to their principals not to (1) actively exploit their positions within the corporation for their own personal benefits . . . ."). One who facilitates that breach may also be liable. *See*

Saks Fifth Avenue, Inc., 272 Va. at 189 (under Va. Code 18.2-500)("Saks, having facilitated Thompson's actions [the former employee of a competitor], was also liable to James for Thompson's breach of fiduciary duty.").

While the contours of the claim are somewhat murky and the Court agrees that the basis for Hipage's claimed damages is not set forth, the Court believes that Hipage has sufficiently pled this claim under notice pleading standards to enable a response. Whether the information disclosed—the contract specifics with Paetec—amounted to a breach of Unger's duties is a determination that should await a more developed factual record and briefing. Access2Go and Broadline can seek more specific detail on this claim through discovery.

Access2Go points out that Hipage does not allege that Access2Go is vicariously liable in this count, and it is true that a principal and agent cannot form a conspiracy. However, it is clear throughout Hipage's counterclaims, third party complaint, and responses that Hipage seeks to hold Access2Go vicariously liable for Broadline's actions. *See*, *e.g.*, d/e 68, pp. 11-12. Not repeating the vicarious liability in the count is not fatal to the claim.

### III. Motion to Strike Relief Sought

Access2Go's requests to strike punitive damages from the claims for unjust enrichment and conspiracy to induce contract breach are moot, since Hipage dropped the former claim and the Court is recommending dismissal of the latter claim.

Among its requests for relief, Hipage asks for dismissal of Access2Go's complaint with prejudice. (Counterclaims, d/e 20, prayer for relief, ¶¶ A, C). Access2Go seeks to strike this request as "exceed[ing] the scope and purpose of [the] Amended Counterclaims" (d/e 43, p. 19). In the Court's opinion, striking this request is unnecessary. It is clear that the prayer for relief seeks judgment in Hipage's favor and against Access2Go; inclusion of the request, although unnecessary, is not "redundant, immaterial, impertinent, or scandalous . . . ."

WHEREFORE, the Court RECOMMENDS that the motions to dismiss by Access2Go and Broadline be granted in part and denied in part (d/e's 42, 74). The Court recommends dismissal of Hipage's claims for fraudulent inducement to contract, rescission, and common law conspiracy to induce breach of contract. The Court otherwise recommends that the

motions be denied. If this recommendation is accepted, Hipage will have the following claims remaining:

**Hipage's remaining counterclaims against Access2Go:**
Count III:   Virginia statutory conspiracy, Va. Code § 18.2-499
Count VII:  conspiracy to breach duty of loyalty and fiduciary duty
Count VIII: violation of Virginia Uniform Trade Secrets Act
Count IX:  conspiracy to violate Virginia Uniform Trade Secrets Act

**Hipage's remaining third party complaint claims:**
Count III:   Virginia statutory conspiracy, Va. Code § 18.2-499
Count VII:  breach of duty of loyalty and fiduciary duty
Count VIII: conspiracy to breach duty of loyalty and fiduciary duty
Count IX:  violation of Virginia Uniform Trade Secrets Act
Count X:   conspiracy to violate Virginia Uniform Trade Secrets Act

Any objections to this Report and Recommendation must be filed in writing with the Clerk of the Court within ten working days after service of a copy of this Report and Recommendation. See 28 U.S.C. § 636(b)(1). Failure to timely object will constitute a waiver of objections on appeal. Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986). See also Local Rule 72.2.

ENTER:   August 10, 2009

*s/ Byron G. Cudmore*
_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE